## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Douglas A. Kelley, as Trustee for Petters Company, Inc., and Petters Group Worldwide, LLC; John R. Stoebner, as Trustee for Polaroid Corporation, et al.; and Randall L. Seaver, as Trustee for Petters Capital, LLC, | Civil Nos. 11-193 (SRN/JJG), 11-194 (SRN/JJG), and 11-196 (SRN/JJG) |

Plaintiffs,

**MEMORANDUM OPINION AND ORDER**

v.

JPMorgan Chase & Co.; JPMorgan Chase Bank N.A.; One Equity Partners LLC; Jacques A. Nasser; Lee M. Gardner; Charles F. Auster; James W. Koven; Rick A. Lazio; J. Michael Pocock; William L. Flaherty; and Ira H. Parker,

Defendants.

_____

| | |
|---|---|
| Douglas A. Kelley, as Trustee for Petters Group Worldwide, LLC, | Civil No. 11-197 (SRN/JJG) |

Plaintiff,

v.

**MEMORANDUM OPINION AND ORDER**

JPMorgan Chase & Co.; and JPMorgan Chase Bank N.A.,

Defendants.

_____

Thomas E. Jamison, Douglas L. Elsass, K. Jon Breyer, and Lori A. Johnson, Fruth, Jamison & Elsass, PLLC, 3902 IDS Center, 80 South Eighth St., Minneapolis, MN 55402, for Plaintiffs.

John R. McDonald, and Kevin M. Decker, Briggs & Morgan, P.A., 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendants' motion for withdrawal of certain adversary proceedings from this district's bankruptcy court (Doc. No. 1.)[1]  For the reasons stated below, this Court denies the motion without prejudice.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Collapse of Petters' Ponzi Scheme

Thomas J. Petters was convicted in December 2009 on twenty counts of fraud, conspiracy and money laundering stemming from his operation of an extensive and long-running Ponzi scheme.  United States v. Petters, No. 08-364 (RHK/AJB), 2010 WL 1254353, *1 (D. Minn. March 24, 2010).  Before his downfall, Petters had controlled and operated several business entities.  Petters owned Petters Company, Inc. ("PCI"), as well as Petters Group Worldwide, LLC ("PGW"), a holding company for other businesses that Petters owned and controlled, including Petters Consumer Brands, LLC ("PCB"), a wholly-owned subsidiary of PGW.[2]

In April 2005, Petters acquired Polaroid Corporation by purchasing Polaroid

---

[1]    Defendants filed the same motion with respect to each of the four adversary actions pending before the Bankruptcy Court, thereby triggering the initiation of the four corresponding civil actions now before this Court, Civil Nos. 11-193 (SRN/JJG), 11-194 (SRN/JJG), 11-196 (SRN/JJG), and 11-197 (SRN/JJG).  Loc. R. Bankr. P. (D. Minn.) 5011-1 (providing that clerk of bankruptcy court shall transmit a motion for withdrawal "to the clerk of the district court who shall file and treat the documents as a civil action").  Unless otherwise noted, all citations to the record are to the dockets of these four civil actions.

[2]    The facts are taken largely from the various Complaints, the allegations of which must be taken as true.

Holding Company ("PHC"), which itself (along with certain affiliates) was majority-owned and controlled by Defendants JPMorgan Chase & Co. ("JPMorgan"), its subsidiary JPMorgan Chase Bank, N.A. ("JPMorgan Bank"), and a private equity firm owned and controlled by JPMorgan, One Equity Partners (collectively, "JPMC"). Petters merged PHC with PCB, resulting in two new entities, again named Polaroid Corporation and, its parent, Polaroid Holding Company (collectively, "Polaroid"). Plaintiffs allege Petters used proceeds from his sprawling and long-running Ponzi scheme to acquire Polaroid.

In addition to being the seller in the Polaroid transaction, JPMC also served as financial advisor to Polaroid, and as manager of the syndicate of banks that participated in loans to Polaroid, and JPMorgan Bank provided a $185 million credit facility to Polaroid immediately after it merged with PCB. The debt was repaid before the PCI bankruptcy.

Petters also has had a banking relationship with JPMorgan since 2001. Petters opened several investment accounts with JPMorgan and eventually deposited into them more than $83 million of the proceeds from his Ponzi scheme. Petters used his accounts as collateral for a credit line PGW obtained from JPMorgan Bank.

On September 24, 2008, federal agents raided Petters' offices looking for evidence of his Ponzi scheme. When JPMC learned of the raid, it declared the PGW credit line in default, seized the investment accounts and began to liquidate the approximately $25 million in securities Petters held in those accounts.

Petters was arrested on October 3, 2008, setting in motion numerous legal actions.

### B.    The Ensuing Legal Actions

The collapse of Petters' Ponzi scheme of extensive fraud resulted not only in the criminal prosecution of Petters, but also in numerous civil actions, including the many bankruptcy proceedings at issue here.  On October 3, 2008, Petters, PCI and PGW were placed into receivership in civil litigation brought by the United States.  After Plaintiff Douglas A. Kelley was appointed as Receiver for PCI, PGW, Polaroid and Petters Capital, Kelley petitioned to place PCI and PGW, which were insolvent, into bankruptcy. The PCI and PGW bankruptcy cases were administratively consolidated as In re Petters Company, Inc., No. 08-45257, and assigned to Bankruptcy Judge Gregory F. Kishel. Kelley then was appointed Trustee of the PCI and PGW estates.

On December 18, 2008, Polaroid (and its affiliated debtors) filed for bankruptcy protection under Chapter 11.  The cases are jointly administered as the "Polaroid Bankruptcy," No. 08-46617, and are also assigned to Judge Kishel.  On September 1, 2009, the Polaroid debtors converted the action to one under Chapter 7 and the appointment of John R. Stoebner as Chapter 7 trustee was approved.

In the interim, on June 12, 2009, another Petters entity, Petters Capital, LLC, filed for protection under Chapter 7.  This bankruptcy action, No. 09-43847, was assigned to Bankruptcy Judge Nancy C. Dreher.  Randall L. Seaver was appointed trustee.

As PCI and PGW trustee, Kelley has filed, as of October 11, 2010, over 200 adversary proceedings seeking to recover stolen funds from more than 380 defendants that PCI or PGW had transferred to them.  Judge Kishel is presiding over these

"clawback" cases.  Of particular relevance here are:  (1) three of the clawback cases, adversary proceedings filed in the Bankruptcy Court by Kelley, as bankruptcy trustee of PCI and PGW (as well as by the trustee of the Polaroid Corporation and the trustee of Petters Capital, LLC), Adversary Proceedings Nos. 10-4443, 10-4444, and 10-4445 (collectively, the "Joint Adversary Proceedings"); (2) a separate adversary proceeding filed by Kelley, as trustee of PGW, Adversary Proceeding No. 10-4446 (the "PGW Adversary Proceeding");[3] and (3) a proceeding filed in the District Court by the federal equity receiver for PCI and PGW, Civil No. 11-193 (the "District Court Proceeding"). The receiver for PCI and PGW, Douglas A. Kelley, is also the bankruptcy trustee for PCI and PGW, and thus a Plaintiff in all of the actions at issue here (and the sole Plaintiff in the PGW Adversary Proceeding).

The Joint Adversary Proceedings are brought against Defendants JPMorgan, JPMorgan Bank, One Equity Partners, and several individuals who were officers and/or directors of those entities and Polaroid Holding Company, the former parent company of Polaroid Corporation (collectively, "Defendants").[4]  The other adversary proceeding is filed against only Defendants JPMorgan, and JPMorgan Bank.  The receiver action is brought against the same Defendants involved in the Joint Adversary Proceedings.

---

[3]     The Court will refer to the four adversary proceedings in bankruptcy court, that is, the Joint Adversary Proceedings and the PGW Adversary Proceeding, collectively as the "JPMC Adversary Proceedings."

[4]     The individual Defendants include Jacques A. Nasser, Lee M. Gardner, Charles F. Auster, James W. Koven, Rick A. Lazio, J. Michael Pocock, William L. Flaherty, and Ira H. Parker (collectively, the "Individual Defendants").

Included in the clawback cases are the three Joint Adversary Proceedings, which seek to recover certain transfers of funds–"derived in whole or in part from proceeds of" Petters' Ponzi scheme including Petters' acquisition in 2005 of Polaroid Holding Company for approximately $426 million–by PCI, PGW, Polaroid and Petters Capital made to or for the benefit of Defendants.  (Doc. No. 1, Ex. A, ¶¶ 26-27.)

The separate PGW Adversary Proceeding seeks to recover $300,000 in preferential transfers and to avoid certain obligations upon which those payments were purportedly based.  (Id., Ex. B, at 3.)  In particular, the Trustee seeks to recover $300,000 in transfers that PGW made, in order to pay down its credit line from JPMC, in two payments on September 17 and 18, 2008, that is, shortly before PGW filed for bankruptcy on October 11, 2008.  (Id. ¶¶ 83-85.)  This claim was not included in the Joint Adversary Proceedings because it belongs only to the PCI & PGW trustee.  All of these adversary proceedings, however, seek to avoid transfers made by the debtor and thus likely constitute "core proceedings" under the bankruptcy statute.  11 U.S.C. § 157(b)(2)(E), (F), & (H).

The District Court Proceeding seeks to recover certain transfers Petters made to Defendants of funds derived from his Ponzi scheme, in particular the "amount of all assets that were held in [Petters' investment accounts at JPMC] immediately prior to September 30, 2008," when JPMC seized the investment accounts of approximately $25 million, which Petters had pledged as security for the PGW credit line, and "JPMC began liquidating the assets held in those accounts" after declaring PGW's credit line in default in the wake of the September 24, 2008 raid by federal agents on Petters' offices.  (Doc.

No. 1, Ex. C, ¶ 17.)  Because Petters himself has not filed for bankruptcy, the claim

belongs only to the Receiver.  And although Kelley was appointed trustee for PCI and

PGW after they filed for bankruptcy, he also "continues to act as Receiver for PCI and

PGW for certain matters."  (Doc. No. 1, ¶ 24 n.3.)

The District Court Proceeding, which does not include any claims under the

Bankruptcy Code–and thus was not subject to being referred to bankruptcy court–is, of

course, pending in this Court.  Nevertheless, as Kelley readily discloses, he also seeks

"recovery of all Receivership Estate assets that were transferred to defendants as a result

of the Polaroid acquisition, to the extent those transfers are not recovered in the JPMC

Adversary Proceedings."  (Id. ¶ 28; accord id. ¶ 105.)  Kelley, as Receiver, also seeks

recovery from five of the eight Individual Defendants "[t]o the extent One Equity seeks to

disclaim transfers received by its affiliates, and to the extent such transfers are not

recovered in the Adversary Proceedings.  (Id. ¶ 106.)  Likewise, he seeks to recover from

the remaining three Individual Defendants "all transfers received by [them] for their

Polaroid stock, to the extent such transfers are not recovered in the Adversary

Proceedings."  (Id. ¶ 107.)

Claiming that the Receiver for PCI and PGW asserts the same allegations and

claims in the District Court action as he asserts in his capacity as trustee of the PCI and

PGW bankruptcy estates, such that the adversary proceedings share common issues of

law and fact with the District Court Proceeding, Defendants now move for withdrawal of

the JPMC Adversary Proceedings from the bankruptcy court to this Court.  (Doc. No. 1.)

## II.   DISCUSSION

Under the Bankruptcy Amendments and Federal Judgeship Act of 1984, "the district courts of the United States have 'original and exclusive jurisdiction of all cases under title 11.'" Stern v. Marshall, ___ U.S. ___, 131 S. Ct. 2594, 2603 (2011) (quoting 28 U.S.C. § 1334(a)).  The district courts also have original, but not exclusive, jurisdiction of "civil proceedings arising under title 11, or arising in title 11 cases, or related to those cases."  28 U.S.C. § 1334(a).  Congress divided bankruptcy proceedings into three categories:  (1) those that "aris[e] under Title 11"; (2) those that "aris[e] in" a Title 11 case; and (3) those that are "related to a case under title 11."  Stern, 131 S. Ct. at 2603 (quoting 28 U.S.C. § 157(a)).

Congress also authorized the district courts to "refer any or all such proceedings to the bankruptcy judges of their district."  Id.  By Order of July 27, 1984, the District of Minnesota referred "all bankruptcy cases and related proceedings to the Bankruptcy Judges for the District of Minnesota."  In re Edward Pirsig Farms, Inc., 47 B.R. 376, 377 (D. Minn. 1984).

A bankruptcy judge's authority varies depending "on the type of proceeding involved."  Stern, 131 S. Ct. at 2604.  As part of the 1984 revision of the Bankruptcy Code, Congress identified sixteen illustrative, but not exclusive, types of "[c]ore proceedings," including, as relevant here, "(C) counterclaims by the estate against persons filing claims against the estate," "(F) proceedings to determine, avoid, or recover preferences," and "(H) proceedings to determine, avoid, or recover fraudulent

conveyances." 28 U.S.C. § 157(b)(2).  "Bankruptcy judges may hear and enter final judgments in 'all core proceedings arising under title 11, or arising in cases under title 11.'" Stern, 131 S. Ct. at 2604 (quoting 28 U.S.C. § 157(b)).  "Parties may appeal from final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards." Id. at 2603-04.

"When a bankruptcy judge determines that a referred 'proceeding . . . is not a core proceeding but . . . is otherwise related to a case under title 11,' the judge may only 'submit proposed findings of fact and conclusions of law to the district court.'" Id. at 2604 (quoting 28 U.S.C. § 157(c)(1)).  If objected to, such findings and conclusions are subject to a *de novo* review by the district court, which then enters final judgment in such cases. Id.  District courts may also withdraw any case or proceeding referred to the bankruptcy court. 28 U.S.C. § 157(d).[5]

## A.    Discretionary Withdrawal Standard

This Court "may withdraw, in whole or in part, any case or proceeding referred under this section, . . . on timely motion of any party, for cause shown." 28 U.S.C. § 157(d).[6]  The statute does not define or otherwise address the parameters of what would

---

[5]    The parties disagree whether this District's local bankruptcy rules require a party seeking withdrawal of a reference to first seek such relief from the bankruptcy judge before moving for withdrawal under Section 157(d).  (Doc. No. 5, at 15-17; Doc. No. 7, at 8-9.)  This Court need not resolve that dispute, however, as withdrawal, in any event, is not warranted.

[6]    Although withdrawal is thus often discretionary, "[t]he district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the

continue...

constitute "cause."  In re Burger Boys, Inc., 94 F.3d 755, 762 (2d Cir. 1996); In re

Parklane/Atlanta Joint Venture, 927 F.2d 532, 536 n.5 (11th Cir. 1991);  Holmes v.

Grubman, 315 F. Supp. 2d 1376, 1381 (M.D. Ga. 2004) ("While the statute does not

define what constitutes 'cause shown,' the Eleventh Circuit has held that cause is not 'an

empty requirement.'").

     This Court is unaware of, and the parties have not directed its attention to, any

controlling Supreme Court or Eighth Circuit precedent with respect to the "cause shown"

standard.  Other courts, however, have emphasized that withdrawal "'is an exception to

the general rule that bankruptcy proceedings should be adjudicated in the bankruptcy

court 'unless withdrawal [is] essential to preserve a higher interest.''"  In re Dooley

Plastic Co., 182 B.R. 73, 80-81 (D. Mass. 1994).  "Withdrawal, even discretionary

withdrawal, is permitted in only a limited number of circumstances."  United States v.

Kaplan, 146 B.R. 500, 503 (D. Mass. 1992) (requiring a "clear showing of cause").  And

with respect to "core" bankruptcy matters, the party seeking withdrawal must "overcome

the presumption that bankruptcy courts, and not district courts, should determine core

matters."  Abondolo v. GGR Holbrook Medford, Inc., 285 B.R. 101, 112 (E.D.N.Y.

2002); see In re Burger Boys, Inc., 94 F.3d 755, 762 (2d Cir. 1996) (noting that most

important factor in withdrawal analysis is "whether the claim is core or non-core").  And,

of course, the party seeking withdrawal bears the burden of showing such cause.  Kaplan,

_____

[6]...continue
United States regulating organizations or activities affecting interstate commerce."  Id.
(emphasis added).  Defendants do not contend that withdrawal is mandatory here.

146 B.R. at 503.[7]

The federal courts have articulated various standards, based on assorted factors, for the requisite showing of "cause."  The Fifth Circuit has stated that "considerations of judicial economy" bear on the decision to withdraw the reference.  Holland America Ins. Co. v. Succession of Roy, 777 F.2d 992, 999 (5th Cir. 1985).  Thus, courts "should consider the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process."  Id.  Accord In re Parklane/Atlanta

---

[7]     One court has observed that the statute "creates a presumption that Congress intended to have bankruptcy proceedings adjudicated in the bankruptcy court unless rebutted by a contravening policy."  In re DeLorean Motor Co., 49 B.R. 900, 912 (Bankr. E.D. Mich. 1985).  Furthermore, overcoming the presumption requires "an overriding interest based on a finding by the Court that the withdrawal of reference is *essential* to preserve a higher interest than that recognized by Congress and is narrowly tailored to serve that interest."  Id. (emphasis in original).  Defendants contend that this "compelling cause" standard is unwarranted, a "needlessly restrictive and legally unsound standard" "at the extreme end of the spectrum of standards applied to the determination of 'cause,'" because it is mistakenly derived from the inapposite context of the closure of criminal trials to the public.  (Doc. No. 7, at 13.)  But even accepting Defendants' argument as to the erroneous basis for the DeLorean court's adoption of that standard, other cases–including the two Defendants also object to as representing an improper "extreme" standard–have imposed similarly strict standards without reliance on DeLorean or its rationale.  In In re Washington Mfg. Co., the court concluded that "only a compelling cause warrants withdrawal," and that such a "high" standard is mandated by the fact that Congress inserted the non-mandatory provision "to protect against a constitutional attack" and that commentators suggest that "the cause standard requires more compelling support than a sound discretion standard would." 133 B.R. 113, 116 (M.D. Tenn. 1991).  Similarly, in In re Onyx Motor Car Corp., the court concluded that non-mandatory withdrawal was warranted only where there is (1) a "clear demonstration of 'cause' and, (2) extraordinary circumstances."  116 B.R. 89, 90 (S.D. Ohio 1990).  The court noted that the legislative history reflected "that there was not an intention to allow § 157(d) to become 'an escape hatch through which most bankruptcy matters will be removed'" to district court.  Id. at 91.  In any event, this Court need not rely on the cases to which Defendants object.

Joint Venture, 927 F.2d 532, 536 n.5 (11th Cir. 1991) (noting that while it had "not yet articulated criteria" for withdrawal, the Fifth Circuit had).  Other courts have considered additional factors such as whether the claim is core or non-core, whether withdrawal would promote the efficient use of judicial resources, whether a jury has been demanded and whether withdrawal would prevent delay.  Holmes v. Grubman, 315 F. Supp. 2d 1376, 1381 (M.D. Ga. 2004).

The Second Circuit has held that the most important factor in the withdrawal analysis is "whether the claim is core or non-core."  In re Burger Boys, Inc., 94 F.3d 755, 762 (2d Cir. 1996).  In fact, a court "should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn."  In re Orion Pictures Corp., 4 F.3d 1095, 1101 (2d Cir. 1993).  As the court explained, "hearing core matters in a district court could be an inefficient allocation of judicial resources given that the bankruptcy court generally will be more familiar with the facts and issues."  Id.

**B.     Withdrawal Is Not Warranted Here**

Before addressing whether the movants have demonstrated "cause," the Court first considers the latest developments regarding the constitutionality of the Bankruptcy Code.

**1.     Stern v. Marshall Does Not Require or Otherwise Warrant
          Withdrawal of the Reference**

After oral argument was heard on Defendants' motion, the Supreme Court issued its decision in Stern v. Marshall on June 23, 2011.  On July 6, 2011, Defendants suggested that the decision "calls into question the jurisdiction of bankruptcy courts to

enter final judgment in fraudulent conveyance suits, such as the JPMC Adversary Proceedings, and thus provides an additional reason why the motions to withdraw the reference should be granted."  (Doc. No. 10, at 1.)[8]

In Stern, the Supreme Court, addressing the division of authority between Article III courts and the Article I bankruptcy courts, held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."  ___ U.S. ___, 131 S. Ct. 2594, 2620 (2011).[9]  The Court concluded that Section 157(b)(2), which enumerates sixteen illustrative but non-exclusive "core proceedings"–including "counterclaims by the estate against persons filing claims against the estate"–permits the bankruptcy court to enter a final judgment on her tortious interference counterclaim.  Id. at 2605. Nevertheless, the Court concluded that Article III, which confers the judicial power of the United States exclusively on Article III courts, "does not."  Id. at 2608.[10]  Accordingly, a

_____

[8]     After reviewing the parties initial letter submissions, this Court permitted them to submit additional memoranda regarding the relevance here of Stern v. Marshall. (Doc. No. 12.)

[9]     After her husband died without including her in his will, Vickie Lynn Marshall filed suit in state probate court claiming that her husband's son fraudulently induced his father to sign a living trust that did not include her despite his purported intent to leave her half his property.  Vickie then filed for bankruptcy in federal court.  The son filed a complaint in the federal proceeding, claiming that Vickie had defamed him by inducing her lawyers to tell members of the press that he had engaged in fraud to gain control of his fathers's assets.  He sought a declaration that his defamation claim was not dischargeable in the bankruptcy proceedings.  Vickie then filed a counterclaim for tortious interference with the gift she expected from her husband.

[10]     Under separation of powers principles, the other branches of the Federal
                                                                        continue...

bankruptcy court may not constitutionally enter a final judgment on a state-law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim. Id. at 2620.  The Supreme Court expressly characterized the issue before it, however, as "a 'narrow' one" and its decision as not changing "all that much."  Id.  In fact, it stated that the bankruptcy statute–by purporting to include as a core claim, on which a bankruptcy judge could issue a final judgment, a state-law tortious interference counterclaim by the debtor's estate against a creditor of that estate who had filed a defamation claim against the estate–was merely a "[s]light encroachment" on Article III that would only "chip away at the authority of the Judicial Branch" rather than gutting it wholesale.  Id.

In response, Plaintiffs note that unlike the state-law counterclaim at issue in Stern, the "Trustees' claims against JPMC are quintessential core bankruptcy claims including claims to recover preferences and fraudulent transfers," and that JPMC's settlement payment defense under 11 U.S.C. § 546(e) "is peculiar to the Bankruptcy Code."  (Doc. No. 11, at 2.)  Moreover, Plaintiffs observe that while the Court in Stern addressed whether a bankruptcy court could enter final judgment on such a generic state-law counterclaim that was "in no way derived from or dependent upon bankruptcy law," here

---

[10]...continue
Government may not confer such judicial power "on entities outside Article III," such as the bankruptcy courts.  Id. at 2609.  Thus, Congress generally may not withdraw from the Article III courts and assign to a legislative court, such as the bankruptcy courts, "'matters of common law and statute as well as constitutional law, issues of fact as well as issues of law.'"  Id. (quoting Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S. Ct. 2858 (1982)).

the issue is whether to *now* withdraw from Judge Kishel–who has been presiding over the various Petters' bankruptcy matters for "more than two and a half years" and has issued an extensive case management order governing the Petters adversary proceedings–the JPMC Adversary Proceedings from the more than 280 other clawback cases that are in pre-trial proceedings before him. (Id.)

As Plaintiffs note, their claims against JPMC appear to be quintessential core bankruptcy claims, including claims to recover preferences and fraudulent transfers under Section 157(b)(2)(F) and (H). (Doc. No. 11, at 2.)[11] Of the nine claims asserted by the Trustee in the Joint Adversary Proceedings, six are for fraudulent transfers alleging actual or constructive fraud and are premised on Sections 544 and 548 of the Bankruptcy Code. (Doc. No. 1, Ex. A (Complaint), ¶¶ 120-54.)[12] As the bankruptcy court stated in In re Wencl, such adversary proceedings "clearly" are "core proceeding[s] within the meaning

_____

[11]     This Court recognizes that "[t]he bankruptcy judge shall determine . . . whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." 28 U.S.C. § 157(b)(3). Accordingly, nothing in this Order should be viewed as confining, much less preempting, Judge Kishel's authority to make that determination. But for purposes of resolving the present motion, that factor is relevant, if not key. In re Orion Pictures Corp., 4 F.3d 1095, 1101 (2d Cir. 1993) (stating that a court "should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn," and that "hearing core matters in a district court could be an inefficient allocation of judicial resources given that the bankruptcy court generally will be more familiar with the facts and issues"). And it is sufficiently clear that many of the adversary proceedings before Judge Kishel will likely be deemed "core." But, of course, that factor is only one of several informing this Court's analysis and decision.

[12]     The other claims include one count for "turnover and accounting" under 11 U.S.C. § 542, one count for "unjust enrichment / equitable disgorgement" and one count for "disallowance" under 11 U.S.C. § 502(b), (d). (Id. ¶¶ 116-19 & 155-63.)

of 28 U.S.C. § 157(b)(2)(H)."  71 B.R. 879, 881 (Bankr. D. Minn. 1987) (Kishel, J.).  "In point of fact, the process of garnering fraudulently-transferred assets back into the bankruptcy estate–to the resultant benefit of all creditors–is one of those proceedings which is by its very nature essential to the adjustment and restructuring of debtor-creditor relationships that is at the core of federal bankruptcy jurisdiction."  Id. at 882.

Granted, the bankruptcy statute includes "counterclaims by the estate against persons filing claims against the estate" as a "core" proceeding, and as Stern demonstrates, such "counterclaims" may not constitutionally extend to generic state common-law claims such as tortious interference.  Such claims often have only a fortuitous relationship with bankruptcy rather than being a claim that "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."  131 S. Ct. at 2618.  The claim at issue in Stern, however, was "in no way derived from or dependent upon bankruptcy law," but rather was "a state tort action that exists without regard to any bankruptcy proceeding."  Id.

Moreover, in Stern, the question arose after the bankruptcy court had entered a final judgment.  Here, however, the proceedings at issue are at an early stage of the litigation.  As Plaintiffs contend, "even if Judge Kishel could not issue a final judgment in the JPMC Adversary Proceedings, he has the unquestioned authority to conduct pretrial proceedings and submit proposed findings of fact and conclusions of law to the district court."  (Doc. No. 11, at 3.)  Thus, at a minimum, Stern does not require this Court to withdraw the reference at this time.  Cf. In re Petters Co. (Kelley v. Hofer), 440 B.R. 805,

808-10 (Bankr. D. Minn. 2010) (denying motion to transfer to district court as premature, because demand for jury trial does not require transfer until after completion of summary judgment proceedings); In re Enron Corp., 318 B.R. 273, 275-76 (S.D.N.Y. 2004) (denying withdrawal "at this early stage of the adversary proceeding" and noting that bankruptcy court's retention of case "until the case is trial-ready would further the interests of judicial economy").

### 2.   Defendants Have Not Otherwise Shown "Cause" For Withdrawal At This Juncture Of The Proceedings

Defendants contend that they seek withdrawal "in order to maximize efficiencies and avoid potentially inconsistent results" in light of the fact that the relevant adversary proceedings and the receivership action filed in this Court are "against the same defendants [and] included identical claims and allegations and arise out of the same set of transactions." (Doc. No. 7, at 6.) They assert that their motion for withdrawal is *not* "centered on the existence of a jury trial right" and *not* based on the position that "the adversary proceedings are non-core." (Id. at 11 n.4, 12.)

But attempts to analyze individual withdrawal factors in isolation falters in light of the fact that factors such as efficiency often turn in part on other factors such as whether the proceedings are "core" or "non-core." In re Orion Pictures Corp., 4 F.3d 1095, 1101 (2d Cir. 1993) (stating that court "should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn"). Moreover, while this Court does not disagree that the Complaint in the District Court Proceeding parallels much of the content of the Complaints in the Adversary Proceedings,

that overlap is inevitable in light of the fact that all of the claims emanate from the same underlying Ponzi scheme.  But the fact remains that the Receiver's claims in the District Court Proceeding are *not* bankruptcy claims–such that the action must proceed only before this Court–whereas the Trustees' claims in the Adversary Proceedings are not only mostly bankruptcy claims, but apparently *core* bankruptcy proceedings–such that they likely should (within constitutional bounds) proceed before a bankruptcy judge.

And as Plaintiffs observe, Defendants seek "to pluck the JPMC Adversary Proceedings from the more than 280 other clawback cases that Judge Kishel is currently administering in the PCI/PGW and Polaroid bankruptcies."  (Doc. No. 11, at 2.)  If the JPMC Adversary Proceedings were the *only* bankruptcy proceedings related to the District Court Proceeding, there might be a stronger case for discretionary withdrawal. Cf. In re Wedtech Corp., 81 B.R. 237, 239 (S.D.N.Y. 1987) (exercising discretion to withdraw, for purposes of judicial economy, core proceeding in light of "the overlapping of facts, transactions, and issues in the two cases").

Here, in contrast, principles of judicial economy weigh in favor of the bankruptcy court retaining the Adversary Proceedings, at least for the remaining pre-trial proceedings.  The present situation is, in fact, the converse of that at issue in In re Adelphia Communications Corp. Sec. and Derivative Litig., where the district court noted that the bankruptcy claims "must be seen in a larger context which includes the many cases in or related to the above captioned multi[-]district litigation" centered on a class action.  2006 WL 337667, *4 (S.D.N.Y. Feb. 10, 2006).  Here, in contrast, the

overwhelming bulk of the litigation is before the bankruptcy court, not this Court.

Plaintiffs do not oppose withdrawal "based on the position that the bankruptcy court has authority to enter a final judgment in this matter. Instead, the opposition is based on notions of judicial economy and uniform administration of bankruptcy court proceedings." (Doc. No. 11, at 2.) The proceedings at issue here are part of a much larger web of interrelated legal proceedings. As Judge Kishel already has ruled in denying a motion to transfer to this Court one of the many other adversary proceedings in the overall Petters matter,

> this single adversary proceeding is only one piece of a very large project of dispute resolution, presented to the federal judicial system in this district by the response of the United States Department of Justice to large financial wrongdoing by Tom Petters. The project opened under the criminal jurisdiction of the U.S. District Court, via the lodging of felony charges against Petters and other persons. It quickly moved into the district court's civil jurisdiction; a receivership ancillary to the criminal process was commenced as a measure to contain and suspend further damage to putative victims, and to recapture assets for possible application to forfeiture and restitution during the criminal process. Then, the work moved into the bankruptcy jurisdiction, when the receiver elected to use the process and remedies of bankruptcy as the means to more broadly address and rectify the consequences of Petters's actions.

In re Petters Co. (Kelley v. Hofer), 440 B.R. 805, 809 (Bankr. D. Minn. 2010). While the criminal prosecution took its course, "the receivership process focused on the identification, amassing, and liquidation of assets traceable to the individuals and companies under its direct administration." Id. A number of Petters's corporations were then put into bankruptcy and over the next two years their assets on-hand were stabilized and liquidated. Id.

> It was not until the criminal process was finalized, however, that a much
> broader issue, oriented to both process and result, came to the fore,
> spearheaded by the United States Department of Justice as the party that
> had invoked federal jurisdiction in the first place:  where, and through what
> legal mechanisms, was a comprehensive process of restitution and recovery
> for *all* those harmed by the underlying wrongdoing to be completed?

Id. (emphasis in original).  Negotiations among all of the concerned parties resulted in "a

'Coordination Agreement' jointly approved by [the bankruptcy court] and the district

court (Montgomery, J.) on September 14, 2010," which "embodied a mutual judgment as

to an acceptable means to make as many victims of a complex and long-running artifice

as whole as possible, via a combination of structured legal processes."  Id. (explaining

that the U.S. gave up administrative forfeiture in favor of judicial bankruptcy and

receivership proceedings).  Thus,

> the district court's criminal process was not to entail forfeiture or restitution
> as a means of compensating victims; the district court's receivership
> process was to finish the liquidation of the assets of the individuals subject
> to it, and to distribute the proceeds as appropriate; and as to the corporate
> entities the major vector of recovery, liquidation, and distribution to parties
> holding the status of creditors or victims was to be the bankruptcy process.

Id. at 810 (explaining that "a bankruptcy judge will preside over all of the judicial work

that lies within the statutory and constitutional limits of his judicial authority").  As Judge

Kishel further explained:

> In the case of a proceeding where a party is entitled to a jury trial and will
> not consent to a bankruptcy judge conducting the trial, the bankruptcy judge
> will retain authority over the proceeding until–at the earliest–it is
> established that a trial is necessary–i.e., all possibility of resolution via
> summary adjudication under Rule 56 or otherwise has been exhausted.

Id.  In short, this Court agrees with Judge Kishel's December 2010 summation that

retention of proceedings by the bankruptcy court

> functions to make best use of the specialized expertise of the bankruptcy judiciary, in the substantive law of fraudulent and preferential transfers, the Bankruptcy Code's specific governance over its avoidance remedies, the law of unjust enrichment, and the analysis of record evidence and shifting burdens under Rules 56.  This will promote efficiency in dispute resolution, by making best use of accumulated judicial familiarity with historical context and structural interrelationships, by enabling quicker adjudication on issues that do not involve contests of fact, by narrowing the range of issues in litigation, and by channeling pretrial procedural disputes to a forum that is not distracted by a criminal docket with speedy-trial dictates and the heavy multi-district litigation docket that our district court has.  Finally, the benefit of a uniformity of judicial approach to a docket of litigation with numerous common issues supports the retention of this and all of the other matters, as a single grouping, for the near and mid-future.

Id. at 810-11.

The next month, on January 21, 2011, Judge Kishel issued his "Case Management Procedures" governing the Petters adversary proceedings jointly administered under Civil No. 08-45257.  (No. 08-45257, Doc. No. 961.)  Of particular relevance here are the procedures he established for coordinating and consolidating common issues of law and fact.  (Id. § F.)  Perhaps of greater relevance are the procedures regarding "Jury Trials and Other Pre-Trial Jurisdictional Matters."  (Id. § J.)  Judge Kishel directed that the bankruptcy court "shall retain the judicial authority to preside over all Adversary Proceedings where a party is entitled to a jury trial and will not consent to a bankruptcy judge conducting the trial until–at the earliest–it is established that a trial is necessary to adjudicate all pre-trial matters, including the presentation of all dispositive motions and issuance of decision on them."  (Id.)  Furthermore, Judge Kishel ruled that all motions for "determination of the right to a trial by jury or transfer of an Adversary Proceeding to the

district court shall not be filed until a later time fixed by this Court." (Id.)[13]

Defendants filed the present motions five days later on January 26, 2011. This Court sees no basis, much less need, to disrupt the carefully-crafted procedures already in place by granting withdrawal of the JPMC Adversary Proceedings. Efficiency, uniformity and judicial economy all clearly weigh in favor of the bankruptcy court retaining these adversary proceedings through pretrial procedures. Cf. In re Enron Corp., No. 03-CV-5078 (DLC), 2003 WL 22171695, *2 (S.D.N.Y. Sept. 22, 2003).

Finally, Defendants argue that in light of the non-bankruptcy action pending before this Court, withdrawal is necessary to prevent the "manifestly unfair and judicially inefficient result of requiring JPMC to defend against duplicative claims and allegations on competing tracks in separate forums, while its litigation adversaries get two bites at the same apple." (Doc. No. 1, at 7.) Defendants observe that the allegations and claims in the District Court action "are identical to those [Kelley] asserted as trustee" in the PCI and PGW bankruptcy actions. (Id. at 8.) Moreover, Defendants claim that Kelley expressly acknowledged "that the purpose of the duplicative allegations and claims in the District Court Action is to give plaintiff two bites at the apple," because the "District Court Complaint seeks recovery only 'to the extent those transfers are not recovered in the [Joint] Adversary Proceedings.'" (Id. at 9 (characterizing District Court action as "a

---

[13]     The withdrawal statute expressly permits this Court to withdraw a bankruptcy action "in whole or in part." 28 U.S.C. § 157(d). Granted, the statute also requires that a "motion of any party" be timely, in addition to showing "cause." Id. But in light of the present motion and this Court's resolution of it, any motion for withdrawal after pretrial proceedings are completed would not be deemed untimely.

'do over,' if things do not go [Kelley's] way, in his role as trustee, in the Bankruptcy
Court").)

This Court does not understand the various proceedings as an attempt to get two
impermissible bites at the apple, to obtain duplicative recovery, or to otherwise game the
system. Plaintiffs openly explain the relief they are seeking in the various actions, which
does not amount to any scheme for double recovery, but rather is an attempt to coordinate
the various actions such that the relief obtained in bankruptcy court would dovetail with
that obtained here. As Plaintiffs contend, "[w]hich, if any, transfers related to the
Polaroid acquisition are recoverable by the Receiver [in this District Court Action] can
only be determined *after* the Joint Adversary Proceedings have concluded in Bankruptcy
Court." (Doc. No. 5, at 13 (emphasis in original).)

Moreover, the JPMC Adversary Proceedings before Judge Kishel and the District
Court Proceedings before this Court will hardly be proceeding on separate tracks blindly
ignorant of each other, such that Kelley would be able to get two bites of the apple. And
putting aside whether principles of collateral estoppel would be sufficient to erect a legal
wall against any attempt at the proverbial second bite, Defendants may, if necessary,
move to stay the present action until the adversary proceedings sort out whatever issues
might be of relevance in this District Court action. In short, various mechanisms apart
from withdrawal of the reference are available to coordinate the various proceedings and
to preclude any improper litigation tactics or duplicative recoveries.

In sum, the present motion for withdrawal is, at best, premature. "Defendants may

renew their motion, if necessary, when the case is ready for trial." <u>In re Gaston & Snow</u>, 173 B.R. 302, 307 (S.D.N.Y. 1994).

## III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' motion for withdrawal of the reference [Doc. No. 1] is **DENIED WITHOUT PREJUDICE** (to renewal if and when the relevant adversary proceedings are trial-ready).

Dated:   September 21, 2011                          <u>  s/ Susan Richard Nelson  </u>
                                                                         SUSAN RICHARD NELSON
                                                                         United States District Judge